## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **MIA MAXWELL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:23-cv-472-ECM-CWB** |
| | ) | |
| **TUSKEGEE UNIVERSITY,** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>RECOMMENDATION OF THE MAGISTRATE JUDGE</u>

### I.    Introduction

Mia Maxwell, acting *pro se*, filed this action on August 8, 2023 to assert claims against Tuskegee University, Reginald Ruffin, and Kymberly Holland arising out of her employment as Tuskegee University's Title IX Coordinator.  (*See* Doc. 1).  Each of the defendants now has moved for summary judgment.  (*See* Docs. 58, 60, & 62).  Upon careful review and consideration, the Magistrate Judge will recommend that the motions be granted such that summary judgment is entered in favor of all defendants on all claims.

### II.    Jurisdiction

Because Counts 1, 2, and 3 seek relief under Title VII of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972, subject matter jurisdiction is conferred by 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the … laws… of the United States.").  Count 4 arises under Alabama state law but is "so related to" the federal law claims that it forms "part of the same case or controversy." *See* 28 U.S.C. § 1367(a).  No defendant has contested personal jurisdiction or venue, and the record evidence is adequate to support both.  *See* 28 U.S.C. § 1391; Fed. R. Civ. P. 4(k)(1)(A).

1

## III.    Legal Standard

Summary judgment is appropriate when the moving party shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  A dispute "is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party… . [A fact] is 'material' if it might affect the outcome of the case under the governing law."  *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (citation omitted).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for the motion."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  That responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact.  *Id*.  Alternatively, a movant who does not have a trial burden of production can simply assert that the nonmoving party "cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(B); *see also* Fed. R. Civ. P. 56 advisory committee's note ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials. … [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact.").  Under either scenario, the burden then shifts to the nonmoving party to establish that a genuine dispute of material fact exists as to each element of the underlying claims.  *See Celotex Corp*., 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(c)(1)(A).

To establish a genuine dispute of material fact, the nonmoving party must produce such evidence as would be sufficient for a reasonable trier of fact to return a verdict in its favor.  *See Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001); *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) ("Once the moving

party makes the required showing, the burden shifts to the non-moving party to rebut that showing by producing affidavits or other relevant and admissible evidence beyond the pleadings."). When evaluating whether a genuine dispute of material fact exists, the court must view all of the evidence in a light most favorable to the nonmovant and draw all justifiable inferences from the evidence in the nonmovant's favor. *See McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003); *see also* Fed. R. Civ. P. 56(a). Nonetheless, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## IV.    Factual Background[1]

Plaintiff was hired by Tuskegee University to serve in the role of its Title IX Coordinator on or about November 15, 2021. (Doc. 64-2 at p. 40). At that time, the position was within the External Affairs and General Counsel office, reported to Tuskegee University's General Counsel, and involved overseeing Title IX complaints/investigations, developing and providing Title IX training, and ensuring compliance with Title IX reporting requirements. (*Id.*; Doc. 64-3 at pp. 2-6). A determination later was made that having the Title IX Coordinator report to the General Counsel presented a conflict of interest (Doc. 64-1 at pp. 14-16), and direct reporting from the Title IX Coordinator was transferred to Tuskegee University's Chief Operating Officer and Vice President for Student Affairs, Dr. Rolundus Rice, in December 2022 (*id.*; Doc. 64-10 at p. 2). Plaintiff was informed of the change by Tuskegee University President Charlotte Morris on December 8, 2022. (Doc. 64-6 at p. 36).

---

[1] The facts as stated herein are taken from the evidentiary exhibits attached to the parties' summary judgment filings, reflect the facts deemed material to a proper resolution of the summary judgment issues, and are construed most favorably to Plaintiff.

In the summer of 2022, Plaintiff approached Tuskegee University's Athletic Director, Reginald Ruffin, regarding the nonrenewal of a student's scholarship and a potential violation of NCAA requirements for providing such students with prompt written notice. (Doc. 64-1 at pp. 25-28). After an in-person meeting, Plaintiff sent Ruffin an email summarizing her concerns and recommending that the student's scholarship be reinstated. (Doc. 64-3 at pp. 14-15). Ruffin responded, "[i]t's however the University would like to proceed I have no complaints" but "[i]f you going to give it to him then give it to all the student athletes in the same situation just my opinion." (*Id*. at p. 14). Plaintiff replied, "[i]f there are other students who are similarly situated then the awards should be reinstated." (*Id*.). The exchange concluded with the following email from Ruffin to Plaintiff:

> Well all of them in every sport and I said this is going to get ugly. I'm forwarding to the NCAA because to cover myself you are suggesting it's a NCAA violation and for my career and protection I need for them to be fully aware. This doesn't look good and I want to be fair with this process for everyone. This is the way it has taken place every year here and with all athletic coaches.

(*Id*.).

On August 20, 2022, Plaintiff spoke with Ruffin about another student's allegations against an assistant football coach. (Doc. 64-1 at pp. 28-32). During the ensuing five-minute conversation in Ruffin's office, Ruffin allegedly "started talking … about what [female students] wear, and inappropriate outfits, and [how] he doesn't take meetings with women in the office because women will complain about sexual harassment." (*Id*. at p. 29). Ruffin further allegedly told Plaintiff that female students' clothing "invit[ed] men to say things to them." (*Id*. at p. 30). Ruffin denies making those statements. (Doc. 64-8 at pp. 4-5, ¶ 8).

After the conversation in his office, Ruffin allowed Plaintiff to speak with the coaches to discuss Title IX issues generally. (*Id*. at p. 30). Plaintiff then met privately with the coach against whom a specific allegation had been made. (*Id*. at pp. 31-32). The coach went home afterward

rather than to a scheduled scrimmage—but the parties dispute whether he was expressly instructed to do so by Plaintiff. (Doc. 64-1 at p. 32; Doc. 64-8 at p. 6, ¶ 13). The following day, Ruffin sent an email to Plaintiff, General Counsel Crystal James, and Tuskegee University President Morris stating as follows:

> Good morning Attorney James,
>
> On yesterday I was informed about a situation with one of my coaches and Mrs. Maxwell came to the office to discuss and meet with the assistant coach and with my entire staff. I want to be very clear in asking is there a[n] investigation ongoing and my assistant coach was sent home by Mrs Maxwell. I was not notified by HR nor the General Counsel that it was an investigation ongoing and that he needed to go home. I'm just trying to follow policies and procedures and protocol mandated in the faculty and staff handbook. As stated by Mrs Maxwell I'm not liked at Tuskegee University and I'm ok with that because I'm here in be a servant to these students, athletes, staff, and this university. More importantly do the job I was hired and assigned to do from President Morris. It's not a popularity contest for me. I had to leave to speak at the Montgomery Tuskegee Alumni Luncheon on yesterday at 12:30pm but I asked Mrs Maxwell to contact me if she needed anything else from me. Once I arrived at the scrimmage at Auburn University the assistant coach informed me he had to go home and could not be at work. I just need to know what to tell him because he's called and asked when should he come back to work. There's a lot of missing pieces and just want to be on the same page. We are in this together and I will follow your guidance on this matter.

(Doc. 64-3 at p. 17). James responded that "[n]o one other than the Chief Human Resources Officer or President Morris has the authority to unilaterally send home an employee." (*Id*. at p. 16).

On August 22, 2022, Plaintiff filed a complaint against Ruffin with Tuskegee University's Chief Human Resources Officer, Cassandra Tarver-Ross, alleging that Ruffin's July 27, 2022 and August 21, 2022 emails constituted "harassment and retaliation in violation of Title VII." (Doc. 64-3 at pp. 18-33). After investigating, Tarver-Ross "determined that the complaint [was] unsubstantiated." (*Id*. at p. 34). Plaintiff next filed a Charge of Discrimination with the Equal Employment Opportunity Commission on November 21, 2022 asserting that Ruffin's conduct constituted "harassment and intimidation … on the basis of [her] sex [that] created a

hostile work environment in which the terms and conditions of [her] employment [were] altered." (*Id*. at pp. 71-72). On June 23, 2023, a Determination and Notice of Rights letter was issued by the EEOC. (*Id*. at pp. 75-76). After Plaintiff received the EEOC's right to sue letter, Dr. Rice allegedly "encouraged [her] not to move forward with it and just kind of let things go" and suggested that she "should not take that drastic step [of litigation] because it would make things worse in his estimation." (Doc. 64-1 at pp. 50-51). Plaintiff nonetheless filed this action on August 8, 2023. (*See* Doc. 1).

Plaintiff later was accused by a co-employee of providing alcoholic beverages to a student during a September 23, 2023 football game—resulting in a verbal altercation between Plaintiff and the co-employee that escalated until an on-duty law enforcement officer intervened. (Doc. 64-1 at p. 57). The co-employee promptly filed an internal complaint against Plaintiff on September 25, 2023, accusing her of "unlawful possession of alcohol and serious breach of conduct with a colleague." (Doc. 64-3 at pp. 80, 92; Doc. 64-1 at p. 58). On September 26, 2023, Plaintiff was placed on administrative leave without pay while the complaint was investigated. (Doc. 64-3 at pp. 80-81). An independent third-party investigator ultimately submitted a written report concluding that Plaintiff "did engage in unacceptable behavior on Saturday, September 23, 2023" and "violated the Code of Conduct Policy by initiating a verbal altercation with [a co-employee], making rude, threating or offensive comments or actions towards a staff member." (Doc. 64-9 at pp. 3-4, ¶¶ 8-9; *id*. at pp. 29-30). During the investigation period, it was separately discovered that Plaintiff had received an email from a co-employee containing sensitive information pertaining to the Presidential search that was then underway by the Executive Committee of the Board of Trustees. (*Id*. at ¶ 10; *see also* Doc. 64-10 at p. 4, ¶¶ 6-7 & Doc. 64-6 at p. 53).

Based upon a combination of the investigative findings and discovery of the email, Plaintiff's employment was terminated.  (Doc. 64-9 at p. 4, ¶ 11).  Plaintiff was informed of the termination by letter dated October 16, 2023:

> I am writing to inform you of the completion of the investigation into a complaint filed against you on September 25, 2023. … [I]t was determined that the claim of a serious breach of acceptable behavior was substantiated. … Specifically, you initiated a verbal altercation with a Tuskegee University staff employee by making rude, threatening, or offensive comments or actions towards the staff employee to which you acknowledged in writing.  The investigation also uncovered that you received confidential information that you were not authorized to receive and failed to report to your supervisor.  Accordingly, your employment as the Title IX Coordinator for Tuskegee University will end October 16, 2023.  This termination is for cause based on a serious breach of acceptable behavior on September 23, 2023, and breach of trust and unauthorized possession, use, or copying of records that are property of Tuskegee University.

(Doc. 64-3 at p. 97).  The employee who sent Plaintiff the email likewise was terminated "for sharing confidential information with [Plaintiff]."  (Doc. 64-9 at p. 5, ¶ 12; *see also* Doc. 64-6 at pp. 54-55).

## V.     Discussion

The First Amended Complaint (Doc. 25) filed on October 27, 2023 asserts four claims: Count 1 against Tuskegee University for allegedly violating Title VII by permitting a hostile work environment (*see id*. at pp. 26-27); Count 2 against Tuskegee University for allegedly violating Title VII by retaliating against her for engaging in protected activity (*see id*. at pp. 27-29); Count 3 against Tuskegee University for allegedly violating Title IX by retaliating against her for engaging in protected activity (*see id*. at pp. 29-32); and Count Four against Ruffin and Kymberly Holland[2] for allegedly defaming her (*see id*. at pp. 32-34).

---

[2]  Kymberly Holland at all relevant times was employed by Tuskegeee University as Coordinator of Alumni Affairs and Reunion Programs.  (*See* Doc. 64-7 at p. 2, ¶ 2).  Holland's only factual involvement in the underlying events is discussed in Section V.B.2.

A.    **Count 1**

In Count 1 for "Discrimination Harassment and Intimidation in Violation of Title VII," Plaintiff alleges that Tuskegee University "fail[ed] to provide a work environment free from unlawful harassment and intimidation and fail[ed] to take any corrective action regarding the harassment and intimidation by Reginald Ruffin directed at Plaintiff on the basis of her sex." (Doc. 25 at p. 26, ¶ 58).  In opposing summary judgment (*see* Doc. 68 at p. 20), Plaintiff points to three instances of conduct by Ruffin as constituting unlawful harassment and creating a hostile work environment:  (1) the July 27, 2022 email wherein Ruffin stated "this is going to get ugly" (*see* Doc. 64-3 at pp. 14-15); (2) statements during the August 20, 2022 meeting wherein Ruffin allegedly described female students as wearing "inappropriate outfits" that "invit[ed] men to say things to them" (*see* Doc. 64-1 at pp. 29-30); and (3) the August 21, 2022 email wherein Ruffin stated that Plaintiff had "sent home" one of his assistant football coaches (*see* Doc. 64-3 at p. 17).[3]

Under Title VII, employers are prohibited from "discriminat[ing] against any individual with respect to [the] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1). Title VII has been held to prohibit "the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment."  *Mendoza v. Borden*, 195 F.3d 1238, 1244 (11th Cir. 1999) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *see also Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 809 (11th Cir. 2010) (explaining that a "hostile work environment" can arise when

---

[3]  Plaintiff's summary judgment opposition also references a Facebook post made by Ruffin (*see* Doc. 68 at p. 21), but the content of the Facebook post cannot fairly be said to derogatory toward women generally or Plaintiff specifically such that it might bolster an offensive interpretation of the emails and statements giving rise to Plaintiff's claim in Count 1.

"members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed") (quoting *Oncale v. Sundowner Offshores Svcs., Inc.*, 523 U.S. 75, 80 (1998)).

But "Title VII is not a civility code, and not all profane or sexual language or conduct will constitute discrimination in the terms and conditions of employment." *Reeves*, 594 F.3d at 807; *see also Mendoza*, 195 F.3d at 1245 ("[H]arassment constitutes sex discrimination only when the harassment alters the terms or conditions of employment.").  "A plaintiff wishing to establish a gender-based hostile work environment claim must show that: (1) she belongs to a protected group; (2) she has been subjected to unwelcome harassment; (3) the harassment was based on her gender; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) the employer is responsible for such an environment." *Galdamez v. DHL Air Exp. USA*, 578 F. App'x 887, 896 (11th Cir. 2014) (citing *Reeves*, 594 F.3d at 808).  Tuskegee University argues that Plaintiff has not provided sufficient evidence of the third and fourth elements.  (*See* Doc. 59 at p. 14).

### 1. Whether Ruffin's conduct was based on gender

When assessing a claim for unlawful harassment under Title VII, courts do not consider "[i]nnocuous statements or conduct, or boorish ones that do not relate to the sex of the actor or of the offended party." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000) *overruled on other grounds as recognized by Crawford v. Carroll*, 529 F.3d 961, 973-74 (11th Cir. 2008). Rather, the alleged conduct must have a "sexual or other gender-related connotation[] to be actionable." *Mendoza*, 195 F.3d at 1247; *see also Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1301 (11th Cir. 2007) ("It would be paradoxical to permit a plaintiff to prevail on a claim of discrimination based on indiscriminate conduct."); *Ambus v. AutoZoners, LLC*, 71 F. Supp. 3d 1280, 1299-30 (M.D. Ala. 2014) (limiting analysis of a hostile work environment

claim to harassment that was based on a protected characteristic).  The context of a comment or conduct informs whether it is based on the alleged victim's sex or gender.  *See, e.g., Tonkyro v. Sec'y, Dept. of Veterans Affs.*, 995 F.3d 828, 838 (11th Cir. 2021) (finding that alleged conduct did not amount to actionable harassment when viewed in the surrounding context); *see also Reeves*, 594 F.3d at 810 (discussing "the common-sense rule that the context of offending words or conduct is essential to the Title VII analysis"); *see also Oncale*, 523 U.S. at 81-82 ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.").

Ruffin's emails of July 27, 2022 and August 21, 2022 cannot be deemed gender-based so as to amount to Title VII harassment.  Plaintiff construes the phrase "this is going to get ugly" as "threatened physical and/or professional harm … meant to intimate and harass her … on the basis of her sex."  (Doc. 25 at p. 26, ¶ 58).  But nothing in the phrase "this is going to get ugly" or the context of the email as a whole contains a "sexual or other gender-related connotation[]." *Mendoza*, 195 F.3d at 1247.  Nor does the context of the email reasonably suggest a threat.  The phrase "this is going to get ugly" pertains to a potential action being proposed by Plaintiff that would require the reinstatement of financial awards to all qualifying athletes in every sport.  (Doc. 64-3 at p. 14).  Ruffin's  email statement that Plaintiff directed a coach to go home likewise contains no type of "sexual or other gender-related connotation[]."  *Mendoza*, 195 F.3d at 1247.  Moreover, even construed most favorably to Plaintiff, the facts of record are insufficient to support a reasonable inference that Ruffin sent the July 27, 2022 email or the August 21, 2022 email because Plaintiff was a woman or that he would have used different language had Plaintiff not been a woman.  *See Ambus*, 71 F. Supp. 3d at 1300 (recognizing that statements and conduct not

expressly related to a protected characteristic "may sometimes constitute … harassment" but explaining that "there must be a surrounding context in which it is clear that a comment is 'intended as a[n] … insult'").  Here, Plaintiff admits that her interpretation is based on conjecture (Doc. 64-1 at pp. 35, 41) and that another potential motivation was possible (*id*. at pp. 28, 36).

As to Ruffin's alleged August 20, 2022 statements to Plaintiff regarding female students' attire and women making false allegations of sexual harassment, the Eleventh Circuit has found that gender specific comments can constitute harassment even if "not directed specifically at" the alleged victim.  *Reeves*, 594 F.3d at 811-13 (finding that frequent use of the "terms 'whore,' 'bitch,' and 'cunt,'" along with "vulgar discussion of women's breasts, nipples, and buttocks" and displaying a "pornographic image of a woman," could support a reasonable inference of "repeated and intentional discrimination directed at women as a group").  Ruffin's alleged statements from August 20, 2022 therefore potentially could serve as the necessary predicate for a harassment claim based on gender.  *Gupta*, 212 F.3d at 583 ("[T]he statements and conduct must be of a sexual or gender-related nature … before they are considered in determining whether the severe or pervasive requirement is met.").

## 2.  Whether Ruffin's conduct was severe or pervasive

Harassment must be "sever[e] *or* pervasive[]" to create a hostile work environment under Title VII.  *Reeves*, 594 F.3d at 808 (emphasis in original).  "The environment must be one that 'a reasonable person would find hostile or abusive' and that 'the victim ... subjectively perceive[s] ... to be abusive.'"  *Mendoza*, 195 F.3d at 1246 (quoting *Harris*, 510 U.S. at 21).  To determine whether harassment was severe or pervasive, courts consider the following non-exhaustive factors: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct

unreasonably interferes with the employee's job performance." *Id.* Because these factors cannot be applied with "mathematical precision," courts must consider the "totality of the circumstances." *Smelter v. S. Home Care Servs. Inc.*, 904 F.3d 1276, 1285 (11th Cir. 2018) (internal quotations and citations omitted). Generally, "[o]ne isolated incident of … inappropriate behavior will not amount to actionable … harassment unless the incident is 'extremely serious.'" *McMillian v. Postmaster Gen., U.S. Postal Serv.*, 634 F. App'x 274, 277 (11th Cir. 2015) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

Harassment is severe when it egregiously violates social norms and pervasive when it repeatedly occurs. *See Reeves*, 594 F.3d at 811-12; *see also Smelter*, 904 F.3d at 1285-87 (finding that hearing racist comments daily and being directly called a demeaning racial epithet could constitute severe and pervasive harassment). But harassment is not severe or pervasive when it is minimally offensive or occurs on a limited basis. *McMillian*, 634 F. App'x at 277 (finding that "one-time, ambiguous comment was insufficiently severe to amount to actionable sexual harassment"); *Cheatham v. Dekalb Cnty., Ga.*, 682 F. App'x 881, 888 (11th Cir. 2017) (finding statements from a male captain to a female firefighter that "the only reason why a woman is in the fire service is to cook and do clerical work" and that he "didn't want a woman riding on his [fire truck]" were insufficient evidence of severe or pervasive harassment); *Jackson v. Ala. Dep't of Corrs.*, 643 F. App'x 889, 892 (11th Cir. 2016) (finding that three or four instances of supervisor asking the plaintiff to sit close to him "after tightening his pants around his crotch displaying the outline of his genitals," two instances of standing so close to the plaintiff that she "could feel his breath on the back of her neck," and four instances of telling the plaintiff that she "looked good or smelled good" were not severe or pervasive enough to constitute a hostile work environment).

Even construed most favorably to Plaintiff, the conduct at issue in this case is not so objectively severe or pervasive to be actionable—regardless of how strong Plaintiff's subjective views might be (*see* Doc. 68 at p. 22). First, the alleged harassment was not sufficiently "frequen[t]." *Mendoza*, 195 F.3d at 1246; *see also McMillian*, 634 F. App'x at 277; *compare Smelter*, 904 F.3d at 1285. Additionally, the alleged conduct was not sufficiently "sever[e]." *Mendoza*, 195 F.3d at 1246; *see also Jackson*, 643 F. App'x at 892; *compare Reeves*, 594 F.3d at 811-12. Third, Ruffin's statements cannot reasonably be deemed as "physically threatening or humiliating." *Mendoza*, 195 F.3d at 1246. Viewed in context, Ruffin's statements on August 20, 2022 at most could be characterized as an isolated offensive utterance. *Mendoza*, 195 F.3d at 1246; *see also Gupta*, 212 F.3d at 585. Although Plaintiff does assert that her complaint against Ruffin affected her job duties (*see* Doc. 68 at p. 23), she does not indicate that any harassment by Ruffin affected her job performance. *Mendoza*, 195 F.3d at 1246. The court also is required to "view the evidence 'cumulatively and in the totality of the circumstances,'" *Smelter*, 904 F.3d at 1285 (quoting *Reeves*, 594 F.3d at 808), which here must include a recognition that all of the conduct alleged against Ruffin occurred over a span of approximately one month and did not permeate Plaintiff's two-year period of employment)—weighing strongly against the extent of its pervasiveness and impact. (*See* Doc. 64-1 at pp. 38, 36).

## B.    Count 2

In Count 2 for "Retaliation in Violation of Title VII," Plaintiff alleges multiple adverse actions by Tuskegee University taken in retaliation for protected activity. (Doc. 25 at pp. 27-29, ¶¶ 61-62). Title VII prohibits "employer retaliation on account of an employee's having opposed, complained of, or sought remedies for, unlawful workplace discrimination." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 342 (2013) (citing 42 U.S.C. § 2000e-3(a)). Most commonly,

to prevail on a Title VII retaliation claim "[t]he plaintiff must first make out a prima facie case of retaliation, showing (1) that she engaged in statutorily protected activity, (2) that she suffered an adverse action, and (3) that the adverse action was causally related to the protected activity." *Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1344-45 (11th Cir. 2022) (citation omitted). The burden then shifts to the employer "to articulate a legitimate, non-discriminatory reason or reasons for the retaliation." *Id*. at 1345. The plaintiff in turn must show "that each reason is merely a pretext and that the real reason was retaliation." *Id*. Alternatively, a plaintiff may demonstrate circumstantial evidence that presents a "convincing mosaic" of unlawful retaliation. *See Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1342 (11th Cir. 2023). Regardless of the approach taken, the burden of persuasion is upon the plaintiff to demonstrate "that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Nassar*, 570 U.S. at 360; *see also Yelling*, 82 F.4th at 1340 (explaining that "evidence of only a tagalong 'forbidden consideration' cannot meet [the] summary judgment burden") (citation omitted).

### 1. Suspension and termination of employment

It is not disputed that Plaintiff submitted an internal complaint against Ruffin on August 22, 2022 purporting to assert violations of Title VII. (*See* Doc. 64-9 at pp. 2-3, 8). Nor is it disputed that Plaintiff filed a Charge of Discrimination with the EEOC on November 21, 2022. (*See* Doc. 64-3 at pp. 71-72). It appears from Plaintiff's summary judgment opposition that she is basing her retaliation claim upon the suspension and termination of her employment following those events. (*See* Doc. 68 at pp. 25-27). However, Plaintiff has not presented evidence that would reasonably support a conclusion that protected activity was a but-for cause of such adverse employment actions. *See Jefferson v. Sewon Am., Inc*., 891 F.3d 911, 924 (11th Cir. 2018) ("Stated another way, a plaintiff must prove that had she not complained, she would not have been fired.").

The record reflects that Tuskegee University suspended Plaintiff in late September 2023 in response to a written complaint submitted by a co-employee regarding an incident that occurred during a September 23, 2023 football game.  (*See* Doc. 64-9 at pp. 3, 24).  The complaint alleged that Plaintiff provided an alcoholic beverage to a student and also initiated a verbal altercation with a co-employee that resulted in law enforcement intervention.  (*See* Doc. 64-9 at pp. 24-25).  An independent investigation reported that the allegation regarding alcohol could not be substantiated but that Plaintiff admitted to initiating an altercation and making a threatening statement toward a co-employee, *i.e.*, "We can go right here."  (Doc. 64-9 at pp. 29, 42, 46).  The report from the investigation further noted that Tuskegee University's disciplinary action guidelines provided as follows: "Any employee whose conduct, actions or performance violates or conflicts with Tuskegee University's policies may be terminated immediately and without waiting"; and "Dismissal of an employee: Fighting or serious breach of acceptable behavior."  (*Id*. at p. 30).  And while the independent investigation was taking place during September and October 2023, Plaintiff's supervisor discovered that Plaintiff had received an email from a co-employee containing sensitive information related to official Tuskegee University affairs.  (*Id*.; *see also id*. at p. 4).

Upon completion of the independent investigation, Tuskegee University issued a letter to Plaintiff dated October 16, 2023 terminating her employment and informing her that the investigation had confirmed that "you initiated a verbal altercation with a Tuskegee University staff employee by making rude, threatening, or offensive comments or actions towards the staff employee."  (*Id*. at p. 48).  The termination letter also stated that the decision was being based upon receipt of "confidential information that you were not authorized to receive[] and failed to report to your supervisor."  (*Id*.).  The record further reflects that the other employee involved

in the unauthorized transmission of confidential information likewise was terminated promptly. (*Id*. at p. 5; *see also id.* at p. 51: "Specifically, you shared Board of Trustee confidential information that you were not authorized to share with another Tuskegee University employee and failed to report to your supervisor that you shared the information.").

When an employer defendant proffers a reason for termination that "might motivate a reasonable employer," the plaintiff "must meet that reason head on and rebut it." *Gogel v. Kia Mfg. of Ga, Inc.*, 967 F.3d 1121, 1136 (11th Cir. 2020) (quoting *Chapman v. Al Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc)). Stated differently, "a plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Id*. Plaintiff thus must point to evidence that would be sufficient to overcome the official explanation for her suspension and termination and that would permit a reasonable conclusion of protected activity as an actual but-for cause.

Plaintiff references a conversation with Tuskegee University personnel in the aftermath of her EEOC charge as a basis to discount the justifications set out in the termination letter. (*See* Doc. 68 at p. 26). Plaintiff contends that she was told by Dr. Rice that her continued success and employment could be negatively impacted by proceeding with a lawsuit and that someone had made a suggestion to "just fire her and deal with the fallout." (*Id*.). Plaintiff's sworn testimony, however, undermines her allegation of what was said in that regard. (*See* Doc. 64-1 at p. 51: "He was very vague. It was unclear whether that was his impression or his opinion of what to do or if somebody else had shared that with him."). Even to the extent a most favorable construction of the evidence might suggest that Dr. Rice attempted to dissuade Plaintiff from filing a discrimination lawsuit or that some other unknown person possibly suggested Plaintiff's

termination in connection with protected activity, there simply is no evidence that either Dr. Rice or such other person was the ultimate decisionmaker or had any influence on the termination decision. *See Pennington v. City of Huntsville*, 261 F.3d 1262, 1270 (11th Cir. 2001) ("Where a decisionmaker conducts his own evaluation and makes an independent decision, his decision is free of the taint of a biased subordinate employee."). Nor would the timing of the suspension and termination alone be sufficient. *See Yelling*, 82 F.4th at 1341 (citing *Gogel*, 967 F.3d at 1137 n.15: "[T]emporal proximity alone is insufficient."). Under these circumstances, and additionally considering that an independent investigation concluded that intervening events warranted termination, it would not be reasonable to conclude that protected activity was a but-for cause of the adverse actions about which Plaintiff is complaining—regardless of whether addressed through burden shifting or a convincing mosaic analysis. *See Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1309 (11th Cir. 2023) ("[T]he intervening discovery of employee misconduct can sever the causal inference created by close temporal proximity."). Put simply, there is no evidence that Plaintiff did not engage in the cited conduct or that she would not have been suspended and terminated for the cited reasons in the absence of any preceding protected activity. *See Joseph v. Bd. of Regents of the Univ. Sys. of Ga.*, 121 F.4th 855, 873 (11th Cir. 2024) ("[Plaintiff's] strained inferences of a predetermined outcome, manipulation, and disbelief cannot rebut the Board's legitimate reasons for terminating her.").

Plaintiff incorrectly asserts that her burden is merely to demonstrate that "retaliation was a motivating factor for the defendant's adverse employment action." (Doc. 68 at pp. 30-34) (citing *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016)). But that standard— known as the mixed-motive theory—only permits liability for Title VII discrimination and "does not apply to Title VII retaliation claims." *Yelling*, 82 F.4th at 1338 (citing *Nassar*,

570 U.S. at 360) (emphasis added). "Rather, to succeed on her retaliation claim, [Plaintiff] must show that her protected activity was a but-for cause of the alleged adverse action," which means "that had she not [engaged in the protected activity], she would not have been fired." *Id.* (quotations and citations omitted). For the reasons set out above, Plaintiff as a matter of law cannot make that required showing.

### 2. Retaliatory hostile work environment

In the Complaint, Plaintiff alleged that Tuskegee University engaged in other forms of retaliation such as "refusing to pay for [her] bar application fees," "fail[ing] to inform [her] of a meeting request from the university President for the purpose of making [her] appear insubordinate," "repeatedly encourag[ing] her to quit pursuing her legal claim," and "creating a retaliatory hostile work environment through an escalating pattern of retaliatory conduct." (Doc. 25 at pp. 27-28, ¶¶ 61-62). However, none of those allegations were argued in her summary judgment opposition. (*See* Doc. 68 at pp. 24-29). It is well settled that a party waives any argument that is not asserted in the brief in opposition to summary judgment. *See T.R. by and through Brock v. Lamar Cnty. Bd. of Educ.*, 25 F.4th 877, 884-85 (11th Cir. 2022) (stating that because the appellant "did not raise this argument before the district court in her brief in opposition to the Defendant's motion for summary judgment …, she waived this argument below"); *Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) ("A party cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions."); *Johnson v. Bd. of Regents of Univ. of Ga.*, 263 F.3d 1234, 1264 (11th Cir. 2001) ("Plaintiffs moved for final summary judgment … . Accordingly, it became incumbent upon the Intervenors to respond by, at the very least, raising in their opposition papers any and all arguments or defenses they felt

precluded judgment in Plaintiffs' favor."). Any arguments for retaliation based upon conduct other than the suspension and termination of Plaintiff's employment thus have been abandoned and are deemed waived. *See Wilkerson v. Grinnell Corp.*, 270 F.3d 1314 (11th Cir. 2001) (finding claim abandoned where the plaintiff failed to discuss it in her initial opposition to the defendant's motion for summary judgment) (citation omitted); *Bogle v. Ala. Law Enf't Agency*, No. 22-cv-256, 2023 WL 7190496, *4 n.4 (M.D Ala. Nov. 1, 2023) (finding argument abandoned where party "gives it only one general sentence of reference in his summary judgment [opposition]").

Regardless, the evidence of record would be insufficient to support a retaliatory hostile work environment claim. A hostile work environment can constitute actionable retaliation if it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 861 (11th Cir. 2020) (quoting *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). But "petty slights or minor annoyances that often take place at work and that all employees experience" do not constitute an actionable retaliatory hostile work environment, and "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse." *Burlington*, 548 U.S. at 68. All of the other allegedly retaliatory conduct listed in the Complaint could be described as such "petty slights" or "minor annoyances." *See Harris v. Fla. Agency for Health Care Admin.*, 611 F. App'x 949, 952-53 (11th Cir. 2015) (finding lowered performance evaluations, criticisms from supervisor, and changing supervision organization were "petty and trivial actions" that did not constitute a materially adverse action); *see also Terrell v. Sec'y, Dep't Veterans Affairs*, 98 F.4th 1343, 1356 (11th Cir. 2024) ("The standards for judging hostility are intended to be 'sufficiently demanding to ensure that Title VII does not become a "general civility code."'") (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). The evidence of record

likewise is insufficient to establish protected activity as a but-for cause of any of the alleged retaliatory conduct.  (*See* Doc. 59 at pp. 19-20; *see also* Doc. 64-11 at pp. 4-7, ¶¶ 8, 10, 17).

### C.    Count 3

In Count 3 for "Retaliation in Violation of Title IX," Plaintiff alleges that she suffered unlawful retaliation from Tuskegee University in response to engaging in conduct protected under Title IX.  (*See* Doc. 25 at pp. 29-35, ¶¶ 64-72).  Among the alleged retaliatory acts were that "General Counsel interfer[ed] with the Title IX process" and "bec[ame] visibly angry with Plaintiff in meetings and humiliat[ed] Plaintiff in front of students," "provided directives to other Tuskegee University officials that purposefully conflicted with the information provided by [Plaintiff]," and "took over space utilized by Plaintiff for Title IX hearings and training leaving Plaintiff without space to perform essential work functions thereby preventing Plaintiff from performing her job duties successfully."  (*Id*. at p. 30, ¶ 68).  Plaintiff additionally alleges that "General Counsel also advised the Athletic Director and Head Football Coach to not allow Plaintiff to conduct student athlete Title IX training."  (*Id*.).  Finally, Plaintiff alleges that her "direct supervisor threatened [her] with adverse employment consequences both before and after filing the instant lawsuit" and "followed through with said threat and fired [her] when she both refused to not pursue her claim in court and later informed him of a possible investigation into his conduct that may violate the Tuskegee University Title IX Policy."  (*Id*.).

Although it has been held that claims under Title IX for employment discrimination are preempted by the remedies available under Title VII, *see Joseph*, 121 F.4th at 867-70, Title IX retaliation claims are <u>not</u> preempted by Title VII when based upon complaints asserting non-employment Title IX violations, *see Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 171 (2005) (finding that Title IX provides a right of action for retaliation over an employee's complaint about discrimination against students); *Blalock v. Dale Cnty. Bd. of Edu.*, 84 F. Supp. 2d 1291,

1300 (M.D. Ala. 1999) ("Plaintiff's claim that she was retaliated against for complaining about alleged Title IX violations survives Title VII's preemption, because Plaintiff does not have a remedy under Title VII for this claim."). So, to the extent Plaintiff is attempting to proceed on a theory of Title IX retaliation unrelated to complaints about her <u>own</u> employment conditions, she is not preempted.[4]

As with Plaintiff's Title VII retaliation claim, however, the only retaliatory conduct argued in opposition to summary judgment is Plaintiff's suspension and termination. (*See* Doc. 68 at pp. 27-29). Also as with Plaintiff's Title VII retaliation claim, the record evidence is insufficient to support a reasonable conclusion that protected activity was a but-for cause of those adverse actions in light of the intervening events and independent investigation—despite the close temporal proximity. And as with Plaintiff's Title VII claim, all other potential examples of retaliatory conduct alleged in the Complaint have been abandoned and otherwise would constitute merely the type of "petty slights or minor annoyances that often take place at work and that all employees experience"—not any type of conduct that reasonably could deemed "materially adverse" or that would dissuade protected activity. *Burlington*, 548 U.S. at 68; *Monaghan*, 955 F.3d at 861. The record further would preclude a finding that any of the other instances reasonably could be deemed a but-for result of protected activity divorced from any legitimate business motivation. (*See* Doc. 59 at pp. 19-20 & Doc. 64-11 at pp. 4-7, ¶¶ 8, 10, 17).[5]

---

[4] Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a); *see also Jackson*, 544 U.S. at 171 ("We consider here whether the private right of action implied by Title IX encompasses claims of retaliation. We hold that it does.").

[5] The same substantive standard applies to retaliation claims under Title IX as those arising under Title VII. *See Joseph*, 121 F.4th at 871; *Blaylock*, 84 F. Supp. 2d at 1309.

### D.    Count 4

Count 4 of the First Amended Complaint purports to assert claims for defamation against two of Plaintiff's co-employees.  (*See* Doc. 25 at pp. 32-34, ¶¶ 73-76).  It is firmly established under Alabama law that defamation requires: "1) a false and defamatory statement concerning the plaintiff; 2) an unprivileged communication of that statement to a third party; 3) fault amounting to at least negligence on the part of the defendant; and 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication of the statement." *Flickinger v. King*, 385 So. 3d 504, 512 (Ala. 2023) (citations omitted).

### 1.    Defamation claim against Ruffin

Plaintiff contends that Ruffin defamed her by making statements regarding her management of a Title IX claim against an assistant football coach:

> Defendant Reginald Ruffin defamed Plaintiff by publishing with malice communications, as facts, to third parties that are false and defamatory regarding Plaintiff's management of a Title IX claim in her professional capacity as the Title IX Coordinator causing harm to her professional reputation.  Defendant Ruffin communicated to several parties that Ms. Maxwell, a duly licensed attorney engaged in the wrongful execution of her duties and made untrue statements about [her], casting Ms. Maxwell as a liar.  For an attorney who relies on her reputation, an accusation of dishonesty and the failure to properly follow policy would be an act of moral turpitude.

(*See* Doc. 25 at p. 33, ¶ 74).  The allegations against Ruffin arise out of the August 21, 2022 email that Ruffin sent jointly to Plaintiff, General Counsel James, and President Morris.  (*See* Doc. 68 at p. 35 & Doc. 63 at p. 6).  In its entirety, the email provided as follows:

> Good morning Attorney James,
>
> On yesterday I was informed about a situation with one of my coaches and Mrs. Maxwell came to the office to discuss and meet with the assistant coach and with my entire staff.  I want to be very clear in asking is there a[n] investigation ongoing and my assistant coach was sent home by Mrs Maxwell.  I was not notified by HR nor the General Counsel that it was an investigation ongoing and that he needed to go home.  I'm just trying to follow policies and procedures and protocol mandated in the faculty and staff handbook.  As stated by Mrs Maxwell I'm not

liked at Tuskegee University and I'm ok with that because I'm here in be a servant to these students, athletes, staff, and this university. More importantly do the job I was hired and assigned to do from President Morris. It's not a popularity contest for me. I had to leave to speak at the Montgomery Tuskegee Alumni Luncheon on yesterday at 12:30pm but I asked Mrs Maxwell to contact me if she needed anything else from me. Once I arrived at the scrimmage at Auburn University the assistant coach informed me he had to go home and could not be at work. I just need to know what to tell him because he's called and asked when should he come back to work. There's a lot of missing pieces and just want to be on the same page. We are in this together and I will follow your guidance on this matter.

(Doc. 64-3 at p. 17).

It is clear from the plain language of the email that it contains nothing that reasonably could be construed as "defamatory." The first sentence simply states that Plaintiff had come to his office to meet with staff regarding "a situation with one of my coaches." The second sentence states that Plaintiff then sent the coach home. And a later sentence states that Plaintiff informed Ruffin that he was not liked on campus. None of those factual assertions reasonably could be said to "tend[] to harm the reputation of [Plaintiff] so as to lower [her] in the estimation of the community or to deter third persons from associating or dealing with [her]." *Blevins v. W.F. Barnes Corp.*, 768 So. 2d 386, 389-90 (Ala. Civ. App. 1999) (citations omitted). Rather than containing any "defamatory statement concerning the plaintiff," the August 21, 2022 email is aimed specifically at resolving the question of how Ruffin should respond to the affected coach regarding his return to work status. *See also Kelly v. Arrington*, 624 So. 2d 546, 549 (Ala. 1993) (affirming summary judgment where "the statements made by Mayor Arrington could not reasonably be understood by the average layperson as having a defamatory meaning").

Not only does the August 21, 2022 email lack defamatory content, it was not "published" to a third party as required to support a defamation claim. Ruffin—who was head football coach and athletic director for Tuskegee University—sent the email to Tuskegee University's president, Tuskegee University's general counsel, and Tuskegee University's Title IX coordinator to inquire

about the work status of one of his assistant coaches. That is precisely the type of communication that has been deemed to fall outside the scope of actionable defamation under Alabama law. *See Watters v. Birmingham Hematology and Oncology Assocs., LLC*, 392 So. 3d 42, 51 (Ala. 2023) ("Stated otherwise, statements made to an agent, under these circumstances, are the legal equivalent of statements made directly to oneself. Consequently, as logic commands, no publication has taken place, and without publication no actionable claim for defamation can exist.") (quoting *Davis v. Legal Servs. Ala., Inc*., 472 F. Supp. 3d 1123, 1136 (M.D. Ala. 2020), aff'd, 19 F.4th 1261 (11th Cir. 2021)); *Dixon v. Econ. Co*., 477 So. 2d 353, 354 (Ala. 1985) ("Communications among the managerial personnel of a corporation about the company's business do not constitute a publication … ."); *Brackin v. Trimmier Law Firm*, 897 So. 2d 207, 222 (Ala. 2004) ("Because the statements made by FSCU's employees to Rutledge were published not to a third party but only to Rutledge, an agent of FSCU, and only within the scope of the employees' duties and the scope of Rutledge's agency, those statements cannot, as a matter of law, properly serve as the basis for Brackin's defamation claim against FSCU."); *see also id*. at 222 ("[I]f there is no publication to a third party, there can be no defamation.").[6]

## 2. Defamation claim against Holland

Plaintiff additionally contends that Holland defamed her by making statements challenging her veracity:

---

[6] Although Plaintiff alleges in the First Amended Complaint that "the communications [were] also shared with others outside of the university's employ as other parties shared their knowledge of the e-mail and its contents" (Doc. 25 at pp. 11-12, ¶ 29), no argument or evidence has been submitted in opposition to summary judgment that would substantiate the allegation or show that it was Ruffin who made such further disclosure. Not only has the argument thus been waived, it is well settled that "publication may not be done or established by rumor or report." *Tucker v. Salazar*, 163 So. 3d 375, 382 (Ala. Civ. App. 2014) (quoting *Weir v. Brotherhood of R.R. Trainmen,* 129 So. 267, 270 (1929) and citing *K–Mart Corp. v. Pendergrass,* 494 So. 2d 600, 604 (Ala. 1986)).

> Defendant Kymberly Holland defamed Plaintiff by stating and publishing to a third party, not an employee of the university, as fact, that Plaintiff lied about her complaints against Reginald Ruffin. Said false and defamatory statement was made with malice to cause harm to Plaintiff's professional reputation. Like the statements made by Mr. Ruffin, it follows that Ms. Holland's casting of Ms. Maxwell as a liar equates her actions being those involving moral turpitude.

(Doc. 25 at p. 33, ¶ 75; *see also id*. at p. 13, ¶ 34). The statement at issue was allegedly made by Holland to Tuskegee University Board Member Natalie Knight regarding the internal complaint Plaintiff brought against Ruffin. According to Plaintiff, Holland told Knight that Plaintiff had made false allegations against Ruffin during the complaint process. (*Id*. at p. 13, ¶ 34; *see also* Doc. 68 at p. 35). And the record reflects that Holland and Knight did engage in a brief discussion about Plaintiff at an officially sanctioned alumni event during the summer of 2023:

> 5.     During our conversation, I mentioned to Trustee Knight information I had heard about Ms. Maxwell's allegations against Tuskegee's Athletic Director, Reginald Ruffin. I did not know the specific details of the allegations, and I did not represent to Trustee Knight that what I was telling her was true or accurate. I made clear to Trustee Knight that I had heard from someone else that Ms. Maxwell had lied about something involving AD Ruffin. I did not accuse Ms. Maxwell of lying. Both Ms. Maxwell and AD Ruffin were co-workers of mine, and I had no reason to believe one over the other.

> 6.     As I was speaking, Trustee Knight interrupted me and informed me both that Ms. Maxwell had been her college roommate and that what I had started to tell her about Ms. Maxwell was not true. I responded "ok" and stopped talking about Ms. Maxwell. Because I have known Trustee Knight for so long, I believed her and trusted her judgment. I concluded that the rumor I had heard was not true. Trustee Knight and I never discussed the subject again, nor did we communicate about it in writing.

(Doc. 64-7 at p. 3, ¶¶ 5-6; *see also* Doc. 64-4 at pp. 12-14 & Doc. 64-7 at p. 3, ¶ 5).

Construed most favorably to Plaintiff's position, the statement made by Holland could be viewed as implying that Plaintiff had provided false information against a co-employee during formal proceedings. (*See* Doc. 64-4 at p. 13). The statement therefore cannot be deemed non-defamatory as a matter of law. *See Blevins*, 768 So. 2d at 389-90. It similarly would be improper to determine as a matter of law that the statement was not "published." Even though Holland was

employed by Tuskegee University as its Coordinator of Alumni Affairs and Reunion Programs, even though Knight was serving as a Board Member for Tuskegee University, and even though the conversation occurred at an official Tuskegee University alumni event (Doc. 64-7 at p. 2, ¶¶ 2, 4), it is less than clear whether the conversation was in furtherance of official Tuskegee University business or whether it was a personal conversation arising from the "longstanding relationship" between Holland and Knight (*id*. at p. 2, ¶ 4 & Doc. 64-4 at pp. 12-14).

That said, the defamation claim still fails as a matter of law on other grounds. As stated previously, a claim for defamation requires "either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication of the statement." *Flickinger*, 385 So. 3d at 512. But nowhere here does the First Amended Complaint contain any allegations of special damages, *i.e.*, "material harms that are the intended result or natural consequence of the slanderous statement" and that generally "are limited to 'material loss capable of being measured in money.'" *Butler v. Town of Argo*, 871 So. 2d 1, 18 (Ala. 2003) (quoting *Shook v. St. Bede Sch.*, 74 F. Supp. 2d 1172, 1180 (M.D. Ala.1999) (internal citations omitted); *see also Hughes v. Wal-Mart Stores East, LP*, 846 F. App'x 854, 569-60 (11th Cir. 2021) ("The district court did not err in granting summary judgment on the defamation claim because Mrs. Hughes failed to present the required evidence of special damages."). The record actually reflects the absence of any special damages flowing from the private conversation between Holland and Knight. (Doc. 64-4 at pp. 12-13, 16 & Doc. 54-7 at p. 3, ¶¶ 7-9). Plaintiff thus can proceed on her defamation claim against Holland only if the statement by Holland could be characterized as constituting slander *per se*. *See, e.g., Anderton v. Gentry*, 577 So. 2d 1261, 1263 (Ala. 1991) ("Slander per se is actionable if it imputes to the plaintiff an indictable offense involving infamy or moral turpitude."); *see also Green v. Pike Road Volunteer Fire Prot. Auth.*,

No. 2:15-cv-253, 2016 WL 3102232, *6 (M.D. Ala. June 1, 2016) (granting summary judgment on slander claim).

Nothing in the brief conversation between Holland and Knight reasonably can be viewed as rising to the level of imputing an indictable offense so as to constitute slander *per se*. Holland's comments at most could be taken as implying that Plaintiff was "lying" with respect to allegations made against Ruffin in a pending matter, and Knight described the context of the statement as being "kind of a gossipy conversation" and "coming across as gossip" rather than as overtly factual. (Doc. 64-4 at pp. 13, 16). *See Camp v. Yeager*, 601 So. 2d 924, 927 (Ala. 1992) ("When determining whether a statement is actionable as slander per se, a court must give the language used 'that meaning that would be ascribed to the language by a reader or listener of "average or ordinary intelligence, or by a common mind."'" ) (quoting *Loveless v. Graddick*, 325 So. 2d 137, 142 (1975)). Such comments if coupled with special damages <u>might</u> give rise to an actionable claim for slander but do not amount to slander *per se* in the absence of special damages. *See, e.g., Ceravolo v. Brown*, 364 So. 2d 1155, 1157 (Ala. 1978). "[T]he standard for slander per se is incredibly high," and it should remain so. *Butler v. Dunn*, No. 2:19-cv-530, 2019 WL 7041866, *4 (M.D. Ala. Dec. 20, 2019) ("Basically, Alabama law requires a false accusation that someone has committed a particularly heinous felony."); *see also Cottrell v. Nat'l Coll. Athletic Ass'n*, 975 So. 2d 306, 345-48 (Ala. 2007) (discussing heightened standard for slander per se).

**VI.    Conclusion**

For the reasons stated above, the Magistrate Judge hereby **RECOMMENDS** as follows:

- that Defendant Tuskegee University's Motion for Summary Judgment (Doc. 58) be granted in its entirety;

- that Defendant Kymberly Holland's Motion for Summary Judgment (Doc. 60) be granted in its entirety; and

- that Defendant Ronald Ruffin's Motion for Summary Judgment (Doc. 62) be granted in its entirety.

It is **ORDERED** that all objections to this Recommendation must be filed no later than **September 12, 2025**. An objecting party must identify the specific portion(s) of factual findings/ legal conclusions to which objection is made and must describe in detail the basis for each objection. Frivolous, conclusive, or general objections will not be considered.

After receiving objections, the District Judge will conduct a *de novo* review of the challenged findings and recommendations. The District Judge may accept, reject, or modify the Recommendation or may refer the matter back to the Magistrate Judge with instructions for further proceedings. *See* 28 U.S.C. § 636(b)(1)(C). A party shall be deemed to have waived the right to challenge on appeal a District Judge's order to the extent it is based upon unobjected-to findings or recommendations. The court on appeal may review unobjected-to factual and legal conclusions only for plain error if necessary in the interests of justice. *See* 11th Cir. R. 3-1.

No party may appeal this Recommendation directly to the United States Court of Appeals for the Eleventh Circuit. A party may appeal only from a final judgment ultimately entered by the District Judge.

   **DONE** this the 29th day of August 2025.

_____
**CHAD W. BRYAN**
**UNITED STATES MAGISTRATE JUDGE**